UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                          :

LATINO QUIMICA-AMTEX S.A. (f/k/a Latino
Quimica S.A.), QUIMICA AMTEX S.A. (f/k/a Quimica    :
Amtex, LTDA), and QUIMICA AMTEX S.A. de C.V.,
individually and on behalf of all others similarly situated,   :     03 Civ. 10312 (HB)(DF)

                   Plaintiffs,      :     **MEMORANDUM**
                                                **AND ORDER**
   -against-                   :

AKZO NOBEL CHEMICALS B.V., AKZO NOBEL    :
FUNCTIONAL CHEMICALS, LLC, ATOFINA
(f/k/a Elf Atochem S.A.), ATOFINA CHEMICALS, INC.  :
(f/k/a Atochem North America, Inc. and Elf Atochem
North America, Inc.), DAICEL CHEMICALS        :
INDUSTRIES, LTD., DAICEL (U.S.A), INC.,
DENKI KAGAKU KOGYO KABUSHIKI KAISHA,    :
DENKA CORPORATION, and DENAK CO., LTD.,

                           :
                   Defendants.
-------------------------------------------------------------------X

**DEBRA FREEMAN, United States Magistrate Judge:**

     In this antitrust action, referred to me for general pretrial supervision, the parties have

consented, pursuant to 28 U.S.C. § 636(c), to have this Court decide Defendants' motion to

dismiss the Amended Complaint for lack of subject matter jurisdiction, as well as Plaintiffs'

motion for leave to file a Second Amended Complaint.  (*See* Dkt. 28.)  For the reasons set forth

below, Defendants' motion to dismiss is granted, and Plaintiff's motion for leave to file a Second

Amended Complaint is denied, on the ground that the amendment would be futile.

# BACKGROUND

### A.    Factual Background

Plaintiffs Latino Quimica-Amtex S.A., Quimica Amtex S.A., and Quimica Amtex S.A. de C.V. (collectively, "Plaintiffs") are Mexican, Argentinian, and Colombian purchasers of sodium monochloroacetate and monochloroacetic acid (collectively "MCAA"), which are chemicals used in food, pharmaceutical, herbicide and plastic additive applications.  (First Amended Complaint, filed May 27, 2004 ("Am. Compl.") (Dkt. 23), ¶¶ 1, 7-9, 28.)  Plaintiffs purchased MCAA in foreign markets at prices allegedly fixed by defendants Akzo Nobel Chemicals B.V., Akzo Nobel Functional Chemicals, LLC, Atofina, Atofina Chemicals, Inc., Daicel Chemicals Industries, Ltd., Daicel (U.S.A.), Inc., Denki Kagaku Kogyo Kabushiki Kaisha, Denka Corporation, and Denak Co., Ltd. (collectively, "Defendants"), who are manufacturers of MCAA.  (*Id.* ¶ 10-18, 29, 43.)  According to Plaintiffs, Defendants entered into agreements among themselves and with other MCAA manufacturers, from approximately September 1, 1995 through August 31, 1999, to fix the price of MCAA on a global basis and to allocate MCAA markets throughout the world.  (*Id.* ¶ 29.)[1]  Claiming that they were injured by Defendants' anticompetitive conduct, Plaintiffs commenced this class action suit[2] against Defendants.

---

[1] Defendants Daicel, Akzo, and Elf Atochem have pleaded guilty to criminal antitrust charges for these actions.  (*Id*. ¶¶ 34-37.)

[2] Because no class has yet been certified in this putative class action, the Court must treat the action as an individual action by the named plaintiffs.  *See Sniado v. Bank Austria AG,* 174 F. Supp. 2d 159, 162-163 (S.D.N.Y. 2001) (citations omitted), *vacated on other grounds*, 352 F.3d 73 (2d Cir. 2003), *remanded*, 124 S. Ct. 2870 (2004), *dismissing appeal*, 378 F.3d 210 (2d Cir. 2004).

Despite the fact that Plaintiffs allege that they suffered injury in purchases that were made entirely in foreign markets for delivery in foreign countries (*see id.* ¶¶ 20, 26(c), 29), Plaintiffs nonetheless seek to invoke the jurisdiction of this Court and to hold Defendants liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.[3] Although the Sherman Act generally does not apply to proscribe conduct in foreign markets, Plaintiffs seek the benefit of an exception found in the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a ("FTAIA"), which provides, *inter alia,* that an action challenging foreign conduct may be maintained where that conduct had a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce, and "such effect" gave rise to the plaintiff's claim. 15 U.S.C. § 6a(1), (2). Defendants dispute that this FTAIA exception applies in this case.

**B.     Procedural History**

Plaintiffs initiated this lawsuit on December 31, 2003, seeking treble damages and injunctive relief, as well as attorneys' fees and costs. (*See* Complaint, filed Dec. 31, 2003 (Dkt. 2).) In May 2004, the case was referred to me by the Honorable Harold Baer for general pretrial supervision (Dkt. 20).

When this Court held its first conference with counsel, on May 17, 2004, counsel informed the Court that a then-pending case before the United States Supreme Court, *F. Hoffmann-LaRoche Ltd. v. Empagran S.A.*, involved similar legal issues, and that the Supreme Court's resolution of those issues would likely be dispositive on the question of subject matter jurisdiction in this case. In *Empagran*, plaintiffs, who had allegedly suffered injury in foreign

---

[3] The Clayton Act enables private rights of action to be maintained under the Sherman Act. (*See infra* at 9.)

3

purchases of vitamins, contended that they were entitled to invoke the protections of the U.S.

antitrust laws where the defendants, vitamin manufacturers and distributors, had engaged in a

price-fixing conspiracy that adversely affected customers in both the United States and foreign

countries.  In June 2004, the Supreme Court issued a decision, based on principles of

international comity, as well as statutory language and history, in which the Court dismissed the

plaintiffs' claim to the extent it arose from an adverse effect of the defendants' conduct on

foreign commerce that was independent of any adverse effect of their conduct on U.S. commerce.

*See Empagran*, 124 S. Ct. 2359, 2365-72 (2004).  The Court, however, remanded to the D.C.

Circuit the question of whether the plaintiffs should be permitted to proceed on an alternative

theory of liability arguably included in their complaint – that "because vitamins are fungible and

readily transportable, without an adverse domestic effect (*i.e.,* higher prices in the United States),

the sellers could not have maintained their international price-fixing arrangement and

respondents would not have suffered their foreign injury."  *Id.* at 2372.

When the *Empagran* decision was issued, the parties to this case disagreed as to its

import.  Defendants asserted that it was, indeed, case dispositive, and that this action should

therefore be dismissed, but Plaintiffs (represented by the same counsel as the plaintiffs in

*Empagran*) argued that, as in *Empagran*, Plaintiffs had alleged two theories of liability, and that

they should be permitted to proceed with the alternative theory that the Supreme Court had not

addressed.

The parties did agree that the question of subject matter jurisdiction should be placed

before this Court for resolution before they incurred the cost of further proceedings, and they

consented to have this Court decide that question.[4]  On August 27, 2004, all Defendants, except

Denak Co., Ltd., which appears not to have been served in the action, moved to dismiss the

Amended Complaint[5] under Rule 12(b)(1) of the Federal Rules of Civil Procedure, for lack of

subject matter jurisdiction.  (*See* Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed

Aug. 27, 2004 (Dkt. 30); Memorandum of Points and Authorities in Support of Defendants'

Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed Aug. 27, 2004 ("8/27/04 Def.

Mem.") (Dkt. 31).)  The principal argument advanced in Defendants' motion was that the

Amended Complaint failed to allege adequately that the domestic effect of Defendants' conduct

"gave rise" to Plaintiffs' foreign claim, as required by the FTAIA.  (*See id.*)

Plaintiffs opposed Defendants' motion to dismiss (*see* Plaintiffs' Response to

Defendants' Motion to Dismiss for Lack of Jurisdiction, filed Oct. 1, 2004 ("10/1/04 Pl. Mem.")

(Dkt. 35)), but, one week after filing their opposition papers, Plaintiffs also moved for leave to

file a Second Amended Complaint, so as to add further factual allegations supporting their

current theory of liability (*see* Plaintiffs' Notice of Motion and Motion for Leave to File a Second

Amended Class Action Complaint, filed Oct. 12, 2004 (Dkt. 36); Memorandum of Law in

Support of Motion for Leave to File Second Amended Class Action Complaint, filed Oct. 7,

2004 ("10/7/04 Pl. Mem.") (Dkt. 37)).  Although Plaintiffs maintained that their alternative

---

[4] With the Court's approval, the parties agreed to brief the issue of subject matter jurisdiction first, without prejudice to Defendants' right to file additional preliminary motions pursuant to Federal Rules of Civil Procedure 8, 9, and/or 12, in the event this Court determines that it has subject matter jurisdiction over this action.

[5] Plaintiffs amended their Complaint on May 27, 2004, for the sole purpose of adding defendants Denki Kagaku Kogyo Kabushiki Kaisha, Denka Corporation, and Denak Co., Ltd. The Amended Complaint (Dkt. 23) is substantively identical to Plaintiff's original Complaint.

causation theory was adequately pleaded in their Amended Complaint, they purportedly offered the proposed Second Amended Complaint to enhance and clarify the factual basis for that theory. The additional causation allegations contained in Plaintiffs' proposed Second Amended Complaint were derived from the declaration of an economist, John C. Beyer, Ph.D (*see* 10/1/04 Pl. Mem. at 8; Declaration of John C. Beyer, Ph.D. ("Beyer Decl."), attached to 10/1/04 Pl. Mem. as Ex. 4), which Plaintiffs had submitted to the Court with their papers opposing the motion to dismiss.

Defendants filed a reply in further support of their motion to dismiss, asserting that Plaintiffs, even with their attempt to support their allegations with Dr. Beyer's declaration, failed to allege the necessary causal connection between an anticompetitive effect on U.S. commerce and Plaintiffs' antitrust claim. (*See* Reply Memorandum in Support of Motion to Dismiss for Lack of Jurisdiction, filed Oct. 15, 2004 ("10/15/04 Def. Mem.") (Dkt. 38).) Defendants also opposed Plaintiffs' motion for leave to amend, arguing that Plaintiffs had engaged in unfair "procedural gamesmanship" by waiting for Defendants' motion to dismiss before seeking to amend their pleading, and that the proposed amendment, in any event, would be futile. (*See* Certain Defendants' Opposition to Plaintiffs' Motion for Leave to Amend, filed Oct. 25, 2004 ("10/25/04 Def. Mem.") (Dkt. 39).) On November 11, 2004, Plaintiffs filed a reply in support of their motion for leave to amend. (*See* Plaintiffs' Reply Memorandum In Support of Their Motion for Leave to File a Second Amended Class Action Complaint, filed Nov. 4, 2004 ("11/4/04 Pl. Mem.") (Dkt. 40).)

Subsequent to the parties' submissions of their briefs, the parties supplemented their submissions by providing the Court with copies of briefs and decisions in other cases that, in the

parties' view, had bearing on the pending motion. In particular, the parties kept this Court apprised of the status of the *Empagran* case, as it was briefed on remand and finally decided by the D.C. Circuit in June 2005. *See Empagran,* No. 01-7115, 2005 U.S. App. LEXIS 12743 (D.C. Cir. June 28, 2005). On July 15, 2005, this Court heard oral argument from the parties regarding the adequacy of both the Amended Complaint and the proposed Second Amended Complaint, in light of all relevant authority.

## DISCUSSION

## I. APPLICABLE LEGAL STANDARDS

### A. Rule 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a claim on the ground that the court lacks jurisdiction over the subject matter. Fed. R. Civ. P. 12(b)(1). Such a motion may be based on a facial or factual attack on the complaint. *See Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 887 n.15 (2d Cir. 1996). Regardless of whether the challenge is "facial" or "factual," the plaintiff bears the burden of establishing a court's subject matter jurisdiction. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

Where a defendant makes a facial attack, which only questions the sufficiency of the pleading, a court "must accept as true all material factual allegations in the complaint." *Alonso v. Saudi Arabian Airlines Corp.*, No. 98 Civ. 7781 (SAS), 1999 WL 244102, at *1 (S.D.N.Y. Apr. 23, 1999) (citations omitted). Where, on the other hand, a defendant challenges the factual basis for subject matter jurisdiction, a court is "not obligated to accord presumptive truthfulness to the allegations of the complaint. Rather, it may weigh the evidence on the record

accompanying the Rule 12(b)(1) motion, or hold an evidentiary hearing, and decide for itself the merits of the jurisdictional dispute." *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 404 (S.D.N.Y. 2002); *see A.I.G. Asian Infrastructure Fund, L.P. v. Chase Manhattan Asia Limited*, No. 02 Civ. 10034 (KMW), 2004 U.S. Dist. LEXIS 27334, at *4 (S.D.N.Y. Mar. 25, 2004) (factual attack "requires the Court to determine whether the plaintiff has established facts sufficient to support subject matter jurisdiction").

In this case, Plaintiffs submitted a declaration of fact (from Dr. Beyer) in opposition to Defendants' motion to dismiss, and Defendants made at least some effort to challenge the content of that declaration in reply. (*See* 10/25/04 Def. Mem. at 12 (Plaintiffs "do not appear to have a factual basis to support their causation theory"); *id*. at 12-14 (attacking data discussed in Beyer declaration).) Nonetheless, Defendants clarified at oral argument that they intended to mount only a facial challenge to the Amended Complaint. (*See* Transcript of Civil Cause for Conference, dated July 15, 2005 ("7/15/05 Tr."), at 6.) Further, Defendants explained that, to the extent they argued that Plaintiff's proposed further amendment would be futile, their challenge to the proposed Second Amended Complaint was also intended to be a facial attack. (*Id*. at 6-7.) Thus, this Court must accept as true the allegations of the Amended Complaint and evaluate its sufficiency on that basis. Similarly, to the extent the Court considers the adequacy of the proposed Second Amended Complaint, the Court must also consider that pleading on its face.

### B.   Rule 15(a)

Rule 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). A "motion to amend should be denied if there is an 'apparent or declared reason – such as undue delay, bad faith or dilatory motive . . . repeated failure to cure

deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of an amendment, [or] futility of amendment.'" *Dluhos v. Floating and Abandoned Vessel Known as "New York,"* 162 F.3d 63, 69 (2d Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Where a court would lack subject matter jurisdiction over the case as pleaded in the proposed amendment, the court may deny leave to amend on the ground of futility.  *See Chan v. Reno*, 916 F. Supp. 1289, 1302 (S.D.N.Y. 1996).

### C.     Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA")

Section 1 of the Sherman Antitrust Act provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."  15 U.S.C. § 1.  Private parties injured "by reason of anything forbidden in the antitrust laws" have the right to bring suit for treble damages, costs (including reasonable attorneys' fees), and injunctive relief, through Sections 4 and 16 of the Clayton Act.  15 U.S.C. §§ 15, 26.

In 1982, Congress enacted the FTAIA as an amendment to the Sherman Act, to clarify the extraterritorial reach of United States antitrust laws.  *See O.N.E. Shipping, Ltd. v. Flota Mercante Grancolombiana, S.A.*, 830 F.2d 449, 451 (2d Cir. 1987).  The FTAIA provides that

> [The Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless –
>
> > (1)    such conduct has a direct, substantial, and reasonably foreseeable effect –
> >
> > > (A)    on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
> > >
> > > (B)    on export trade or export commerce with foreign

> nations, of a person engaged in such trade or commerce in the United States; and
>
> (2) such effect gives rise to a claim under the provisions of [the Sherman Act], other than this section.

15 U.S.C. § 6a. For the Court to have subject matter jurisdiction over a Sherman Act claim for "conduct involving trade or commerce . . . with foreign nations," the requirements of both Sections 6a(1) and (2) of the FTAIA must be satisfied. *See Empagran*, 124 S. Ct. at 2365; *Sniado*, 352 F.3d at 77; *Den Norske Stats Oljeselskap AS v. Heeremac Vof*, 241 F.3d 420, 421-22 (5th Cir. 2001).

## II.  **DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

In this case, the parties dispute whether the Amended Complaint sufficiently alleges subject matter jurisdiction based on the FTAIA. Because Defendants are only raising a facial attack to the Amended Complaint (*see supra* at 8), the Court will accept the material factual allegations of the Amended Complaint as true. As Plaintiffs bear the burden of establishing subject matter jurisdiction, Plaintiffs must demonstrate that they have set forth allegations sufficient to plead the elements of both Sections 6a(1) and (2) of the FTAIA.

### A.  **Allegations of the Amended Complaint**

In their Amended Complaint, Plaintiffs allege that Defendants conspired to fix MCAA prices and allocate MCAA markets in the United States and worldwide (Am. Compl. ¶¶ 2, 29), and that this "unlawful price fixing and market allocation conduct had adverse effects in the U.S. and in other nations that caused injury to Plaintiffs in connection with their foreign MCAA purchases" (*id*. ¶ 29). With respect to the nature of the domestic injury caused by Defendants' conduct, Plaintiffs plead that "Defendants' anticompetitive conduct directed at foreign markets

10

caused injury to U.S. commerce by reducing the U.S. MCAA market's competitiveness and by directing anticompetitive conduct at U.S. commerce." (*Id.* ¶ 31.) "As a result," Plaintiffs allege, "Defendants' anticompetitive conduct directed at the foreign MCAA market had the requisite direct, substantial and reasonably foreseeable effect on U.S. commerce needed to invoke the Sherman Act." (*Id.*)

With respect to Plaintiffs' foreign injury, Plaintiffs further plead that, in their purchases of MCAA, they "paid more for MCAA than they would have paid absent Defendants['] . . . conspiracy to harm U.S. and worldwide commerce," and that "Plaintiffs suffered injuries-in-fact when they paid inflated MCAA prices." (*Id.* ¶ 43.) Thus, Plaintiffs plead that "Defendants' conspiracy to fix MCAA prices and allocate MCAA markets around the world caused Plaintiffs injuries-in-fact" (*id.*), and that "Defendants' . . . conspiracy to harm U.S. and world commerce directly injured Plaintiffs" (*id.* ¶ 44).

### B.    FTAIA Requirements

#### 1.    Section 6a(1)

As this case involves neither import nor export trade, Plaintiffs argue that the above-quoted allegations of the Amended Complaint satisfy Section 6(a)(1) because those allegations adequately describe "conduct" that had a "direct, substantial, and reasonably foreseeable effect . . . on trade or commerce which is not trade or commerce with foreign nations," *i.e.,* conduct that had a direct, substantial, and reasonably foreseeable effect on *domestic* commerce.

The Second Circuit has adopted a broad interpretation of the "conduct" proscribed by the Sherman Act. In *Sniado*, the Second Circuit directed the district court to interpret "conduct" as the entire worldwide conspiracy alleged by the plaintiffs, rather than the more narrowly-described

activity of "charging . . . supra-competitive fees in Europe." 352 F.3d at 78. Similarly, this Court finds that Plaintiffs have alleged "conduct" consisting of Defendants' participation in "an over-arching worldwide conspiracy to raise, stabilize and maintain MCAA prices," and Defendants' establishment of price-fixing agreements for MCAA both inside and outside of the United States. (Am. Compl. ¶ 29.)

With respect to whether this conduct had a "direct, substantial, and reasonably foreseeable effect" on domestic commerce, the Amended Complaint alleges, as quoted above, that Defendants' conduct, which included fixing MCAA prices in the United States (*id.*), resulted in "supra-competitive MCAA prices in the U.S." (*id.* ¶ 1), as well as "injury to U.S. commerce by reducing the U.S. MCAA market's competitiveness and by directing anticompetitive conduct at U.S. commerce" (*id.* ¶ 31). Assuming the truth of these allegations, the Amended Complaint adequately pleads that Defendants' conduct had the necessary effect on domestic commerce within the meaning of Section 6a(1). *See Den Norske,* 241 F.3d at 426-27 (allegations that international conspiracy "compelled Americans to pay supra-competitive prices" were sufficient to satisfy the first requirement of the FTAIA); *see also M.M. Global Services, Inc. v. The Dow Chemical Co.*, No. 3:02 cv 1107 (AVC), 2004 U.S. Dist. LEXIS 4139, at *15-18 (D. Conn. Mar. 18, 2004) (finding, on reconsideration, that allegations that price-fixing conspiracy was intended to prevent erosion of U.S. prices were sufficient to allege conduct having direct, substantial, and reasonably foreseeable effect on domestic commerce); *cf. Eurim-Pharm GmbH v. Pfizer Inc.*, 593 F. Supp. 1102, 1106-07 (S.D.N.Y. 1984) (allegations that defendants' worldwide conspiracy created artificially inflated prices, without specifying where prices were inflated, were insufficient to allege requisite effect on U.S. commerce).

2.    **Section 6a(2)**

Defendants' challenge to the adequacy of the Amended Complaint focuses primarily on the type of causation allegation that would be necessary to satisfy Section 6a(2) of the FTAIA. Under that subsection, the domestic effect of a defendant's alleged anticompetitive conduct, as pleaded under Section 6a(1), must "give rise to a [Sherman Act] claim."

In *Empagran*, the Supreme Court rejected an argument that, as long as an alleged global conspiracy caused both domestic and foreign adverse effects, this provision of the FTAIA could be satisfied. As part of its analysis, the Court considered whether allowing citizens of foreign countries to take advantage of U.S. antitrust laws, when their claims had little connection to the United States, would upset "a balance of competing considerations that [other nations'] own domestic antitrust laws embody." 124 S. Ct. at 2368. The Court reasoned that principles of prescriptive comity counseled against construing Section 6a so as to permit U.S. actions for claims arising from the independent foreign effects of foreign conduct:

> Where foreign anticompetitive conduct plays a significant role and where foreign injury is independent of domestic effects, Congress might have hoped that America's antitrust laws, so fundamental a component of our own economic system, would commend themselves to other nations as well. But, if America's antitrust policies could not win their own way in the international marketplace for such ideas, Congress, we must assume, would not have tried to impose them, in an act of legal imperialism, through legislative fiat.

*Id*. at 2369.

The Supreme Court therefore concluded that, where subsection 6a(2) refers to a domestic effect giving rise to "a claim," the "claim" must not be a hypothetical domestic claim that could have been raised by others, but rather must be the *plaintiff's* claim, *i.e.,* "the claim at issue" in the

case. *Id.* at 2371-72; *accord Sniado v. Bank Austria AG*, 378 F.3d 210, 212 (2d Cir. 2004) (under *Empagran*, plaintiff "must allege that the European conspiracy's effect on domestic commerce gave rise to *his* claims") (emphasis added).

Here, Plaintiffs allege that they suffered injuries solely in foreign transactions, and their claims seek compensation for those foreign injuries. Plaintiffs, therefore, must not only allege, as they have, that Defendants' global price-fixing conspiracy resulted in a reduction in the competitiveness of the U.S. market for MCAA, but they must also allege that this adverse domestic effect of the conspiracy "gave rise to" their claim for injuries in foreign markets. Defendants further argue that the statutory language requiring that the domestic effect of a defendant's conduct "give[] rise to" the plaintiff's claim suggests that Plaintiffs must plead more than an indirect, "but for" connection between the alleged domestic effect and their claim. Rather, Defendants argue that the Plaintiffs must plead that the domestic effect of Defendants' conduct directly, or "proximately" caused the foreign injury that is the subject of Plaintiffs' claim, and that Plaintiffs have not done so in the Amended Complaint.

On remand in *Empagran*, the D.C. Circuit squarely addressed the question of whether allegations of "but for" causation can be sufficient to satisfy the causation requirement of Section 6a(2). With the plaintiffs in that case conceding the point, the court determined that "[t]he statutory language – 'gives rise to' – indicates a direct causal connection, that is, proximate causation, and is not satisfied by the mere but-for 'nexus' the [plaintiffs] advanced in their brief." *Empagran*, 2005 U.S. App. LEXIS 12743, at *9. In reaching this conclusion, the court considered the types of comity issues that had concerned the Supreme Court in its remand decision:

14

> This interpretation of the statutory language accords with principles of 'prescriptive comity' – 'the respect sovereign nations afford each other by limiting the reach of their laws' . . . – which required that we 'ordinarily construe[] ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations.' . . . To read the FTAIA broadly to permit a more flexible, less direct standard than proximate cause would open the door to just such interference with other nations' prerogative to safeguard their own citizens from anti-competitive activity within their own borders.

*Id*. at 9-10 (citing, *inter alia*, *Empagran*, 124 S. Ct. at 2366, 2367).

In this case, as well, plaintiffs' counsel conceded at oral argument that "but for" causation is insufficient, and that the causation standard contemplated by the "gives rise to" language of Section 6a(2) of the FTAIA is "proximate" causation. (*See* 7/15/05 Tr. at 21-22 ("Proximate cause is the standard. The U.S. [effect], in fact, has to have proximately caused the foreign injury."); *see also id.* at 55-56.) Thus, the Court is not presented with any dispute between the parties as to the correct standard to apply. In any event, this Court is persuaded by the reasoning of the D.C. Circuit that "proximate" causation is a standard more consistent with principles of prescriptive comity than a looser, "but for" standard.

Further, the proximate causation standard advanced by both parties is consistent with antitrust principles requiring that an antitrust injury-in-fact be caused directly by a defendant's conduct. In considering whether a plaintiff's injury was "too remote" to establish standing under Section 4 of the Clayton Act, the Supreme Court noted that, while "[a]n antitrust violation may be expected to cause ripples of harm," "[i]t is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 477 (1982). Moreover, because Congress

enacted Section 4 of the Clayton Act with language from Section 7 of the Sherman Act – which had been read to incorporate the common law principle of proximate cause – the Supreme Court concluded that Congress presumably intended this same "judicial gloss" to apply to the Clayton Act. *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 532-34 (1983); *see also Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 267-68, 272 (1992) (holding that right to sue for treble damages under Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c), which was modeled after Section 4 of the Clayton Act, requires showing that defendant's violation was proximate cause of the plaintiff's injury).

Having conceded that the adequacy of their pleading should be measured under a proximate causation standard, Plaintiffs assert that the Amended Complaint sufficiently alleges, even if in a cursory manner, that the domestic effect of Defendants' global conspiracy *did* proximately cause Plaintiffs' foreign injury. In asserting this argument, Plaintiffs point, in particular, to their allegation that Defendants' "unlawful price fixing and market allocation conduct had adverse effects in the United States and in other nations that caused injury to Plaintiffs in connection with their foreign MCAA purchases." (Am. Compl. ¶ 29; 7/15/05 Tr. at 30, 32.) This, however, is insufficient. Read carefully, the allegation highlighted by Plaintiffs only vaguely pleads that "adverse effects in the U.S. *and in other nations* . . . caused injury to Plaintiffs in connection with their foreign MCAA purchases." (*Id*. ¶ 29 (emphasis added); *see also id*. ¶ 26(c) (alleging that one of the questions common to the putative class is "[w]hether Defendants and their con-conspirators' unlawful price fixing conduct had adverse effects in the U.S. *and in other nations* that caused injury to Plaintiffs in connection with their foreign MCAA

purchases") (emphasis added).) As the allegation does not even plead that it was the effect on U.S. commerce, rather than an effect on foreign commerce, that gave rise to Plaintiffs' claim, it is patently inadequate to plead the necessary direct causal link.

Plaintiffs' further allegations that "Defendants' conspiracy to fix MCAA prices and allocate MCAA markets around the world caused Plaintiffs' injuries-in-fact" (*id*. ¶ 43), and that "Defendants and their co-conspirators' illegal contract, combination and conspiracy to harm U.S. and world commerce directly injured Plaintiffs" (*id*. ¶ 44), fare no better. While these allegations plead, in general terms, a causal relationship between Defendants' conspiracy and Plaintiffs' injuries abroad, they support only a theory that Plaintiffs were injured by Defendants' global anticompetitive conduct. Nothing in these allegations even suggests that Plaintiffs' injuries were directly, or proximately, caused by the domestic effect of Defendants' alleged conspiracy. Thus, these allegations are also insufficient to satisfy Section 6(a)(2) of the FTAIA.

Because the Amended Complaint fails to plead that a domestic effect of Defendants' conduct gave rise to Plaintiff's claims, the Amended Complaint fails, on its face, to allege subject matter jurisdiction, and the motion to dismiss is granted.

## III. PLAINTIFFS' MOTION TO AMEND

Turning to Plaintiffs' motion for leave to file a Second Amended Complaint, the Court must determine whether that motion should be rejected as an unfair litigation tactic, and, if not, whether the proposed new pleading cures the deficiencies of the Amended Complaint.

### A. "Procedural Gamesmanship"

Defendants first argue that Plaintiffs' motion to amend should be rejected as too late. Defendants point out that Plaintiffs' counsel were well aware of the "alternative theory" argued

to the Supreme Court in *Empagran*, as they also represented the plaintiffs in that case.  (*See* 8/27/04 Def. Mem. at 24; 10/25/04 Def. Mem. at 3.)  Defendants further note that the Supreme Court's decision in *Empagran* was issued on June 14, 2004, prior to this Court's setting of a briefing schedule for a motion challenging the adequacy of Plaintiffs' alternative theory in light of that decision.  (*See* 10/15/04 Def. Mem. at 1.)  Further, the Court notes that the Second Circuit's decision in *Sniado*, which had been remanded by the Supreme Court for further consideration in view of *Empagran*, was issued on August 5, 2004, prior to Defendants' deadline for submitting their motion to dismiss in this case.  Although Plaintiffs assert that it was the decisions in *Empagran* and *Sniado* that led them to seek leave to amend their pleading (*see* 11/4/04 Pl. Mem. at 5-6), they waited until after Defendants filed their motion on August 27, 2004, to try to present the Court with their additional proposed allegations.

Defendants' frustration over Plaintiffs' timing is understandable.  Defendants spent time and money preparing a substantial motion to dismiss a pleading based on one legal issue, and Plaintiffs were well aware that this issue would be the sole focus of the motion.  Defendants assert that Plaintiffs' failure to include their new allegations in their first Amended Complaint, or to seek leave to amend further prior to Defendants' deadline for its motion to dismiss, is evidence of Plaintiffs' effort to engage in impermissible "piecemeal pleading," with the advantage of being able to respond directly to Defendants arguments for dismissal.  (*Id*. at 3-4 (citing *Zito v. Leasecomm Corp.*, No. 02 Civ. 8074 (GEL), 2004 WL 2211650, at *26  (S.D.N.Y. Sept. 30, 2004).)

In response to Defendants' assertions of unfair "gamesmanship," Plaintiffs' counsel explained to the Court in oral argument that the idea of submitting an expert declaration did not

occur to them until they received Defendants' motion to dismiss, and that, only after they had

submitted the declaration to "beef up" their opposition to the dismissal motion did they realize

that the Beyer declaration was "only so good[,] as an attachment to [the opposition] brief," and

that "it would really be great to have a complaint with all this good stuff in it related to proximate

cause . . . ." (7/15/05 Tr. at 25-26.)  Plaintiffs argue that this case differs from *Zito*, on which

Defendants rely in support of their position that the Court should disregard the motion to amend,

because, in *Zito*, the plaintiffs sought leave to amend only after they had already amended their

complaint once to cure deficiencies, and after the defendants had moved for dismissal a second

time.  (11/4/04 Pl. Mem. at 6-7.)

    Although the Court is sympathetic to Defendants' view that, if Plaintiffs were going to

seek leave to amend their allegations related to subject matter jurisdiction, they should have done

so before Defendants briefed their motion to dismiss, the Court also notes that this is Plaintiffs'

first attempt to amend these allegations, and that Defendants have been able to respond to the

new allegations without undue additional briefing.  The Court also notes that this case is still at

an early stage, and that no judicial decisions have yet been issued regarding the adequacy of

Plaintiffs' pleading.  *Cf. Sniado,* 378 F.3d at 213 (declining to grant plaintiff leave to re-amend

his pleading after rejection of his amended complaint on appeal).  Under the circumstances, the

Court will consider the merits of Plaintiffs' motion to amend.[6]

_____

    [6] In considering the motion to amend, the Court will also consider all arguments made by
Defendants in opposition.  Plaintiffs' request to strike 10 pages of Defendants' opposition brief
(*see* 11/4/04 Pl. Mem. at 2-3 n.1), is denied, as that request, which is directed to a brief rather
than a pleading, does not constitute a proper motion to strike under Fed. R. Civ. P. 12(f).  *See*
2 James Wm. Moore et al., *Moore's Federal Practice* § 12.37[2] (3d ed. 2004) ("Only material
included in a 'pleading' may be the subject of a motion to strike, and courts have been unwilling
to construe the term broadly.").  Further, Fed. R. Civ. P. 12(g) does not authorize the Court to

### B. **Futility**

Defendants argue that Plaintiffs' motion to amend should, in any event, be denied because Plaintiffs' proposed new pleading would still be inadequate on its face to withstand a motion to dismiss, and the amendment would thus be futile. (*See* 10/25/04 Def. Mem. at 2, 5-14; 7/15/05 Tr. at 6.) Having found Plaintiffs' Amended Complaint to be deficient, the question for the Court is whether the proposed Second Amended Complaint suffers from the same infirmity or, instead, sufficiently pleads the direct causal connection that is missing from the Amended Complaint.

In their proposed new pleading, Plaintiffs do spell out their causation allegations in greater detail, although Plaintiffs maintain that they have not changed their theory of causation, but only expanded upon their allegations in order to "clarify" them. (10/7/04 Pl. Mem. at 3; *see* 11/4/04 Pl. Mem. at 6.) For example, Plaintiffs now clarify that "MCAA is an interchangeable commodity" that is sold in a "worldwide geographic market where price movements in one geographic sub-market would have a ripple-effect on prices in other geographic sub-markets." (Second Amended Class Action Complaint, dated Oct. 7, 2004 ("2d Am. Compl."), attached to Mot. to Amend as Ex. A, ¶ 23.) Plaintiffs further clarify their previous "worldwide" market allegations by alleging that, "[g]iven MCAA's commodity nature and worldwide flow, Defendants' and their co-conspirators' MCAA prices charged in countries other than the U.S. closely resemble and are highly correlated with U.S. MCAA prices." (*Id.* ¶ 24.)

_____

"strike" any portion of Defendants' opposition brief, as the arguments raised do not, despite Plaintiffs' suggestion, constitute a "defense or objection" within the meaning of that Rule.

Plaintiffs go on to plead that, had it not been for the alleged price-fixing conspiracy, foreign MCAA purchasers "would have been able to purchase MCAA in the U.S. at competitive prices" (*id*. ¶ 25), and that the global conspiracy thus "could not have succeeded" without Defendants' agreement to fix MCAA prices in the United States (*id*. ¶ 26). Essentially, Plaintiffs plead that Defendants' alleged global price-fixing conspiracy resulted in artificially high MCAA prices in the United States, without which it would not have been possible for the conspiracy to sustain artificially high MCAA prices in Plaintiffs' home countries. (*See id*.) If the prices had been legitimately competitive in the United States, then, Plaintiffs maintain, foreign purchasers would have been able to purchase MCAA here instead, destroying the Defendants' ability to continue selling at inflated prices in Mexico, Argentina, and Colombia. (*See id*.) In their own words, Plaintiffs allege:

> Without an agreement affecting U.S. commerce, foreign-based MCAA purchases would have arbitraged, purchasing MCAA at competitive U.S. prices and exporting it into their home countries. Arbitrage from the U.S. would have defeated Defendants' and their co-conspirators' attempts to fix prices and allocate market shares in other countries worldwide. Hence, Defendants and their co-conspirators' worldwide MCAA price fixing conspiracy necessarily had to include the U.S. and, thus, any anticompetitive effects that occurred in the U.S. necessarily would also have been felt by foreign MCAA purchasers.

(*Id*.)

Simply stated, the theory embodied in these allegations is that, because of the fungible nature of the product at issue and the worldwide nature of the product market, the adverse effect of Defendants' conduct on U.S. commerce was "necessary" for the success of their global

conspiracy, with its resulting impact in foreign countries.[7]  This theory, however, was explicitly

rejected by the Second Circuit in *Sniado.*   In *Sniado*, the plaintiff had sued European banks,

alleging that he paid supra-competitive service fees for exchanging currency, exclusively in

European countries, as a result of a price-fixing conspiracy among the defendants.  *See Sniado*,

378 F.3d at 212.  On remand from the Supreme Court for reconsideration in light of *Empagran*,

the plaintiff argued, for the first time, that the Sherman Act reaches foreign injury that is "not

independent" of the foreign conspiracy's effect on United States commerce.  *See id.*  In

exercising its discretion to consider the viability of the plaintiff's new, "alternative theory" of

liability, the Second Circuit held that, even if it were reasonable to infer from the plaintiff's

pleading that "'the domestic component' of the alleged 'worldwide conspiracy' was

'*necessary . . . for the conspiracy's overall success*," such allegations would be "too conclusory

to avert dismissal."  *Id.* at 213 (emphasis added).

Here, Plaintiffs allege that any domestic anticompetitive effects of Defendants'

conspiracy "necessarily would also have been felt" by purchasers of MCAA in foreign countries.

(2d Am. Compl. ¶ 26.)  Yet, as noted above, this concept of having been injured by an inevitable

"ripple effect," as Plaintiffs themselves phrase it (*id.* ¶ 23), would not be sufficient to afford

_____

[7] The Court notes that Plaintiffs do not actually allege that they, themselves, would have purchased MCAA in the United States, had prices been lower in the U.S. market.  Rather, Plaintiffs plead that they did not purchase MCAA in the U.S. market "in part" because the U.S. prices were not significantly lower than prices in Plaintiffs' home countries (2d Am. Compl. ¶¶ 12-14), suggesting that there may have been any number of reasons why they chose not to make their purchases here.  It is thus apparent that Plaintiffs are not relying on their own experiences with attempted arbitrage in contending that their claims arise from a domestic effect of the alleged conspiracy.  Rather, Plaintiffs are apparently relying on broader market forces, by which markets are inter-dependent and an impact on any one geographic sub-market will necessarily affect the others.

Plaintiffs standing to maintain their antitrust claims (*see supra* at 15-16). Similarly, under the FTAIA, the mere inter-dependence of markets cannot be sufficient to satisfy the requirement that a domestic effect "gives rise to" the plaintiff's claim. *See Den Norske,* 241 F.3d at 427 (under the FTAIA, alleging an "interrelatedness" between prices paid in geographic sub-markets is insufficient; "the FTAIA requires more than a 'close relationship' between the domestic injury and the plaintiff's claim; it demands that the domestic effect 'gives rise' to the claim").

At bottom, Plaintiffs' allegations merely describe, albeit with greater specificity than their initial allegations, a "but for" theory of causation – that, but for the conspiracy's anticompetitive effect in the United States, the global conspiracy "could not have succeeded." (2d Am. Compl. ¶ 26.) Indeed, addressing the identical theory in *Empagran,*[8] the D.C. Circuit held: "While maintaining super-competitive prices in the United States may have facilitated the [defendants'] scheme to charge comparable prices abroad, this fact demonstrates at most but-for causation." 2005 U.S. App. LEXIS 12743, at *11.

---

[8] As summarized by the D.C. Circuit in *Empagran*: "The appellants' theory in a nutshell is as follows:

> Because the appellees' product (vitamins) was fungible and globally marketed, they were able to sustain super-competitive prices abroad only by maintaining super-competitive prices in the United States as well. Otherwise, overseas purchases would have purchased bulk vitamins at lower prices either directly from U.S. sellers or from arbitrageurs selling vitamins imported from the United States, thereby preventing the appellees from selling abroad at the inflated prices. Thus, the super-competitive pricing in the United States 'gives rise to' the foreign super-competitive prices from which the appellants claim injury.

2005 U.S. App. LEXIS 12743, at *8-9 (footnote omitted).

Despite acknowledging that the causation theory they articulated before the D.C. Circuit in *Empagran* is precisely the same theory at issue here, Plaintiffs' counsel urge the Court to disregard the D.C. Circuit's decision, and, instead, to accept the reasoning of the district courts in *M.M. Global Services, Inc. v. The Dow Chemical Company*, 329 F. Supp. 2d 337 (D. Conn. Aug. 11, 2004), and *In re Monosodium Glutamate Antitrust Litigation*, No. 00-MDL-1328 (PAM), 2005 U.S. Dist. LEXIS 8424 (D. Minn. May 2, 2005), which upheld subject matter jurisdiction under the FTAIA on the basis of somewhat different allegations.

In *M.M. Global Services*, the plaintiffs purchased, in the United States, products manufactured by U.S. defendant Union Carbide, and resold those products in India. 329 F. Supp. 2d at 339. Claiming that the defendants had compelled them to agree to a price fixing conspiracy for the resale of those products, the plaintiffs alleged that this anticompetitive conduct directly resulted in diminished competition "'in the sale and resale of [Union Carbide] products in and from the United States.'" *Id.* at 342. Further, the plaintiffs alleged that, "'as a result of such effect on competition, [the] [p]laintiffs were injured by being precluded from effectively and fully competing and maximizing their sales of products.'" *Id.* These allegations suggest a considerably more direct nexus to U.S. commerce than the allegations made here.

The facts alleged in *In re Monosodium Glutamate Antitrust Litigation,* which involved an alleged global conspiracy to fix the price of monosodium glutamate ("MSG"), are more similar to those alleged here, as the plaintiffs did not plead any personal contact with the United States, but nonetheless contended that their foreign injuries resulted from the conspiracy's adverse domestic effects. 2005 U.S. Dist. LEXIS 8424, at *3-4. In that case, however, the plaintiffs alleged that the defendants fixed U.S. prices and controlled U.S. markets "not merely to capture

24

cartel profits in the United States, but also to allow the cartel to be effective anywhere in the world." *Id.* at *4. In other words, the plaintiffs alleged that the defendants "included the United States in the cartel precisely to extract cartel profits from purchasers around the world without risk of arbitrage." *Id.* These allegations ascribe to the defendants deliberate conduct aimed at the United States for the specific, intended purpose of furthering their anticompetitive conduct elsewhere. This, too, is a more direct causation allegation than Plaintiffs make in this case, where Plaintiffs allege a global price-fixing conspiracy, but do not allege that Defendants acted to control the U.S. MCAA market for the purpose of furthering their scheme in the foreign markets in which Plaintiffs operated. Rather, as noted above, Plaintiffs merely rely on general market principles to allege that, in a global market, an effect of anticompetitive conduct in one location (*i.e.,* the United States) will cause a ripple effect that will necessarily "be felt" in others. The causal link described by this theory is simply too indirect to support this Court's subject matter jurisdiction.

Finally, the Court notes that Plaintiffs' proposed new pleading does contain a few boilerplate allegations of direct causation. In one paragraph of the Second Amended Complaint, for example, Plaintiffs make the conclusory allegation that the U.S. effect of Defendants' conspiracy "directly injured" Plaintiffs. (2d Am. Compl. ¶ 43.) And in other paragraphs, Plaintiffs use the "gives rise to" language of the FTAIA, pleading that "the effect on U.S. commerce gave rise to Plaintiffs' antitrust injuries." (*Id.* ¶¶ 27, 38.) Without the factual predicate to support these allegations, however, they cannot be read to plead the requisite causal link between the conspiracy's domestic effect and Plaintiffs' foreign claim. *See Hirsch v. Arthur*

*Anderson & Co.*, 72 F.3d 1085, 1088, 1092 (2d Cir. 1995) (holding that the court need not credit legal conclusions that are unsupported by the factual allegations pleaded) (citations omitted).

As the Court finds that Plaintiffs' proposed Second Amended Complaint would not withstand a motion to dismiss for lack of subject matter jurisdiction, Plaintiffs' motion for leave to file a Second Amended Complaint is denied as futile.

## CONCLUSION

For all of the foregoing reasons, Defendants' motion to dismiss the Amended Complaint is granted, and Plaintiffs' motion for leave to file a Second Amended Complaint is denied. The Clerk is respectfully requested to enter judgment dismissing the Amended Complaint and to close this case on the Court's docket.

Dated: New York, New York
      September 19, 2005

                              SO ORDERED

                              DEBRA FREEMAN
                              United States Magistrate Judge

Copies mailed to:

Linda P. Nussbaum, Esq.
Cohen, Milstein, Hausfeld & Toll, PLLC
150 E. 52nd St., 30th Floor
New York, NY 10022

Paul T. Gallagher, Esq.
Cohen, Milstein, Hausfeld & Toll, PLLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005

Mark S. Goldman, Esq.
Weinstein, Kitchenoff, Scarlato, Karon & Goldman Ltd.
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103

Daniel R. Karon, Esq.
Weinstein Kitchenoff Scarlato Karon & Goldman Ltd.
55 Public Square, Suite 1500
Cleveland, OH 44113

Felipe Echecopar
Echocopar Asesores, S.C.
Fuente de Templanza No. 31 (PH-2)
Col. Lomas de Tecamachalco
53950 Naucalpan, Edo. de Mex.

D. Jarrett Arp, Esq.
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036

Stephen C. McKenna, Esq.
Gibson, Dunn & Crutcher LLP
1801 California Street, Suite 4200
Denver, CO 80202

Daniel G. Swanson, Esq.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071

William A. Wargo, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue, 47th Floor
New York, NY 10166

James D. Miller, Esq.
Clifford Chance US, LLP
31 West 52nd Street
New York, NY 10019

Bruce Alan Colbath, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

James F. Lerner, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

Allan Paul Victor, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

Steven E. Bizar, Esq.
Buchanan Ingersoll, PC
1835 Market Street, 14th Floor
Philadelphia, PA 19103

Margaret M. Zwisler, Esq.
Howrey, Simon, Arnold & White, LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004

Andrew R. Leder, Esq.
Belair & Evans
61 Broadway, Suite 1320
New York, NY 10006